UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| TRACEY PATTERSON, | : | Bankruptcy No. 04-32201DWS |
| Debtor. | : | |
| TRACEY PATTERSON, | : | Adversary No. 07-0023 |
| Plaintiff, | : | |
| v. | : | |
| LJR INVESTMENTS, LLC OF BUCKS COUNTY, aka LJR Investments, LLC, | : | |
| Defendant. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court are the (1) Complaint of the debtor Tracey Patterson ("Debtor") pursuant to 11 U.S.C. § 506 to determine the extent of the lien held by LJR Investments, LLC of Bucks County ("LJR") on real property owned by Debtor located at 1241 Myrtlewood Street, Philadelphia, PA ("Myrtlewood") and 2914 Thompson Street, Philadelphia, PA ("Thompson") (the "Adversary Proceeding") and (2) Debtor's Motion to

Modify Plan after Confirmation (the "Modification Motion").[1] This is the second litigation between these parties. The first, LJR's motion for relief from stay to exercise its state law remedies against Myrtlewood, Thompson and a third property owned by Debtor at 3029 Baltz Street, Philadelphia, PA ("Baltz") (together with Myrtlewood and Thompson, (the "Properties"), sets forth the legal relationship between the parties, and my findings will be incorporated herein to the extent relevant to the disposition of the Adversary Proceeding. In re Tracey Patterson, 2007 WL 987306 (April 2, 2007 Bankr. E.D. Pa.) ("Patterson I").[2] Debtor contends that LJR is either unsecured or undersecured by reason of the City of Philadelphia (the "City") tax and municipal liens on the Myrtlewood and Thompson properties and asks that I fix LJR's secured claim at zero. This litigation is intended to support Debtor's failure to treat LJR's lien on these properties in his Chapter 13 plan. Resolution of the Adversary Proceeding requires a determination of the amount of the prior liens and the value of Myrtlewood and Thompson and approval of the Modification Motion requires a finding that there is no value above the prior City liens to attach to LJR's claim.

---

[1] LJR contends it was not served with the Modification Motion. Debtor which filed a Certificate of Service which does not name the parties served, did not indicate otherwise. Accordingly, I entered a bench order directing its counsel to promptly file a response which it has now done objecting to the Modification Motion on the grounds that the modified Chapter 13 plan improperly treats its secured claim.

[2] I concluded that LJR had a valid mortgage on the Properties, including Baltz which Debtor claimed had been released, but denied stay relief provided Debtor made monthly adequate protection payments of $200 pending the adjudication of the Adversary Proceeding.

**BACKGROUND**

Debtor commenced this bankruptcy case on September 10, 2004. While it took Debtor until August 3, 2005 to file Schedules that listed all his properties and the acknowledged secured claims against them, Doc. No. 54 and 55,[3] he still did not schedule LJR who therefore did not get notice of the commencement of the case and the bar date for filing proofs of claim. Doc. No. 12. Debtor's rationale was that LJR was not a creditor. Accordingly, Debtor's Second Amended Plan confirmed on September 8, 2005, Doc. No. 64, and the prior versions, made no mention of LJR. As it does not appear that LJR was on notice of the Chapter 13 proceedings, it is not surprising that it did not object to the proposed plans. On November 21, 2006 LJR filed a motion for relief seeking to exercise its state law remedies with respect to the Properties. Debtor responded by filing the above-captioned Adversary Proceeding. As noted, the motion for relief was decided on April 2, 2007 and Debtor commenced making monthly adequate protection payments of $200 to LJR with respect to Baltz, and filed the Modification Motion to treat arrears under its confirmed Chapter 13 plan with respect to Baltz only.[4]

---

[3] I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995) (*citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules).

[4] Debtor does not claim that LJR is undersecured on Baltz and treats LJR's claim with respect to Baltz under its recently filed Amended Chapter 13 Plan. According to Debtor's
(continued...)

Because LJR had not been given notice of the bankruptcy case, it not only did not have an opportunity to object to the Chapter 13 plan but also had not filed a proof of claim. It has done so now.[5] Myrtlewood, Thompson and Baltz are three of thirty-three properties subject to a blanket mortgage held by LJR.[6] In the proof of claim,[7] LJR claims a debt of $791,354, $197,838 of which it allocates to these three properties as follows: $87,929 Thompson, $87,928 Baltz and $21,982 Myrtlewood. The claim is consistent with Resnick's testimony concerning the allocation of LJR's debt to Debtor and the three properties.

In <u>Patterson I</u>, I found that the lien of the blanket mortgage is valid. Moreover, it is undisputed that it is subject to liens of the City for unpaid real estate taxes and municipal

---

(...continued)
bankruptcy counsel Pamela Reiss, the plan's payment obligation of $7,200 with respect to Baltz represents the release price for that property under LJR's blanket mortgage less the payments made by Debtor. No evidence of any release prices was presented. LJR objects to the treatment as being inadequate to amortize its lien on Baltz which it contends is $87,928. LJR's President Monte Resnick testified to that number which was derived by allocating the total asserted claim of $791,354 among the various properties subject to the blanket mortgage. Fortunately this contested matter does not require me to liquidate the Baltz secured claim but rather only to determine whether the $7,200 proposed to be paid over the life of the Plan comports with § 1325(a)(5).

[5] To date Debtor has not filed an objection.

[6] The original purchase in April 1986 of the thirty-three properties ("Total Properties") by Stephen V. Aurello and Robert G. LaPlante ("Prior Owner") was financed pursuant to a note in the principal amount of $420,000 and the conveyance of a blanket mortgage to Robert H. Glazier ("Glazier"). In December 1998 Prior Owner sold ten of the Total Properties, including the three to Debtor. The sales were subject to the blanket mortgage. On April 2, 2005 Glazier assigned the blanket mortgage to LJR in consideration of the payment of $14,500. <u>Patterson I</u>, 2007 WL 987306, at *1.

[7] I take judicial notice of the proof of claim as evidence of LJR's claim only, not the truth of the matters asserted.

water and sewer charges.  The Second Amended Complaint pled those liens as follows:

>Myrtlewood- tax liens of $4,640.87 and water and sewer liens of $6,401.00 (aggregating $11,041.87); and

>Thompson- tax liens of $2,333.41 and water and sewer liens of $12,541.96 (aggregating $14,875.37).[8]

To support his averment at trial regarding prior liens, Debtor called his bankruptcy counsel[9] who testified that the City had filed two claims in the amount of $2,804.58 and $44,572.47, and that Debtor intended to pay both claims in full under his Chapter 13 plan. He introduced two proofs of claim filed by the City on June 15, 2005 and August 3, 2005

---

[8] In his initial Complaint, Debtor pled that the value of Myrtlewood and Thompson were less than the amount of prior City tax and water and sewer liens and municipal claims against the properties.  Complaint ¶ 3.  LJR filed a motion to dismiss contending, inter alia, that the Complaint was insufficient in failing to plead a value for the properties and the amount of the liens against each. Refusing to dismiss, I allowed Debtor to amend his Complaint to plead with more specificity his claim under § 506(a) with respect to Myrtlewood and Thompson, stating the value of each property and the municipal liens and claims that cause him to aver that LJR's liens are undersecured. Order dated March 3, 2005.  Doc. No. 8.  The Amended Complaint that was filed complied with that directive in pleading the tax and water and sewer liens with respect to each property but also averred "possible municipal claims in some unknown amount."  Doc. No. 10.  This language was perceived by LJR as an attempt to evade the purpose of the amendment, i.e., to put it on notice of the prior liens and claims Debtor would be relying on, and a second motion to dismiss was filed with that claim and another relevant only to Baltz.  After yet another hearing, I entered an Order dismissing the Amended Complaint and allowing the filing of the Second Amended Complaint which strikes the claims with respect to Baltz and conforms to the March 9 Order by "pleading all liens on the Myrtlewood and Thompson Street properties."  Doc. No. 15.  LJR relied on a footnote in that Order which binds Debtor to his representation that he had pled all liens and that no other liens would be counted at trial to move for a nonsuit at the conclusion of Debtor's case contending that this limitation had been fatal to his proof.  Since Debtor had pled certain liens and the property values that his appraiser testified to were less than those values, a nonsuit was not warranted, and the motion was denied.

[9] The Adversary Proceeding was handled by different counsel.

in the amount of $27,009.48 and $44,572.47, respectively. Exhibit P-2 and P-1.[10] Debtor's counsel explained that the City's proofs of claim related to properties in addition to Myrtlewood and Thompson, and stated that the Schedules would reflect the allocation as to each property. An examination of the Amended Schedule D filed shortly after Debtor settled an objection to the City's proof of claim supports that contention. Debtor schedules real estate and water/sewer lien claims in the aggregate amount of $8,983.00 and $15,075.70 against Myrtlewood and Thompson, respectively. These numbers are consistent with the allocation of the unpaid prepetition charges in the City's proof of claim #10 introduced as Exhibit P-1. While the numbers in the Schedules and Proof of Claim are identical, the number in the Complaint is higher for the water liens, Debtor having relied on the earlier and amended proof of claim, Exhibit P-2. The tax liens are essentially the same in each. For the purpose of quantifying the lien claims, I will consider the non-controverted proof of claim, Exhibit P-1, as adopted by Debtor's Schedule D, to establish tax and water/sewer liens of $8,983.00 and $15,075.70 against Myrtlewood and Thompson respectively.

The second part of the equation necessary to render the § 506 determination is the value of each property. Myrtlewood is, and has been since seven months ago, a vacant lot. Exhibit P-13. The house that stood on the property was uninhabitable due to a fire that

---

[10] After working through the various proofs of claim filed by the City, I found that the $27,009.48 claim dated June 15, 2005, Exhibit P-2, has been superceded by the later filed proof of claim, Exhibit P-1. While Exhibit P-2 lists the water and sewer charges on the Properties, Exhibit P-1 covers both the water/sewer charges and taxes. A comparison of the detail shows the same account numbers for the same periods. Finally I take judicial notice that the $2,804.58 claim which Debtor's counsel spoke of relates to Baltz and is not relevant to this dispute.

occurred prior to Debtor's purchase in 1998.  Thompson is a corner unoccupied building that Debtor intends to rehabilitate.  Exhibit P-14.  The valuation evidence consisted of Debtor's testimony[11] and the appraisals of the certified valuation experts John Symanski ("Symanski")[12] on behalf of Debtor and Len Edelson ("Edelson") on behalf of LJR.[13] The following chart reflects the disparate opinions of value for the two properties:

## MYRTLEWOOD

| Appraisal Date | Debtor Testimony[14] | Debtor's Appraiser | LJR'S Appraiser |
|---|---|---|---|
| 9/10/04 | $5,000-$6,000 | $1,500 | $20,000 |
| 9/08/05 | $5,000-$6,000 | $2,000 | $40,000 |
| 6/28/07 | $1,500 | $1,500 | $15,000 |

---

[11]  An owner of property may testify as to his opinion of value without demonstrating any additional qualifications to give opinion testimony.  In re Karakas, 2007 WL 1307906, at *7 (Bankr. N.D.N.Y. (May 3, 2007) (citing cases)).

[12]  In its brief LJR complains of Debtor's failure to timely produce the appraisals he intended to rely upon at trial and the burden imposed upon it to respond to that evidence when it was finally supplied.  However, LJR also concedes that it affirmatively waived any objection to the introduction of that evidence.

[13]  I find both appraisers equally qualified by reason of their education and experience. If there was any deficiency in the appraisal testimony, it resulted from counsel's failure to focus their experts on the date governing these valuations so that neither addressed the economic conditions in the community in September 2005 as impacting on the value of abandoned shells being rehabilitated for resale.  While Debtor argues that Symanski was the more qualified due to the proximity of his office to the subjects, I find that Edelson actually provided more insight into the area, albeit at a later date.

[14]  These values are lower than those reflected in Debtor's Amended Schedule A which fixes a $10,000 value on Myrtlewood and a $13,000 value on Thompson.

## THOMPSON

| Appraisal Date | Debtor Testimony | Debtor's Appraiser | LJR'S Appraiser |
|---|---|---|---|
| 9/10/04 | $9,000 | $8,500 | $18,000 |
| 9/08/05 | $9,500-$10,500 | $10,500 | $50,000 |
| 6/28/07 | $7,000-$8,000 | $15,000 | $65,000 |

Exhibits P-7 through P-9, D-4 through D-6. The three valuation dates represent current appraisals done as of the petition date (9/4/04), plan confirmation date (9/8/05) and the date of trial (6/28/07) as the parties had not discussed what date was applicable in the context of this case.[15] While the evidence reflects widely divergent views of value of each property, the parties do concur that value as of the September 2005 confirmation date is dispositive in this proceeding.[16]

---

[15] Since the appropriate valuation date presented a legal question, I directed the parties to submit briefs. LJR had sought and was granted an extension for its responsive submission, reporting that settlement negotiations were ongoing. The brief now having been filed and no settlement reported, I assume they were unsuccessful and will rule.

[16] Section 506(a) of the Bankruptcy Code, in pertinent part, states as follows:

> value shall be determined in light of the purpose of the valuation and the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a). In anticipation of a need to address the different dates of value proffered by the experts and awaiting the parties' briefs, I observed a less than uniform rule in the decided cases. However, given the parties' agreement that the confirmation date controls, it is not necessary to consider the effect of the passage of time on the creditor's status vis a vis appreciation or depreciation of the collateral.

**DISCUSSION**

As noted above, Debtor seeks a determination that LJR has either an unsecured or undersecured claim within the meaning of § 506(a). This section provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is secured to the extent of the value of such creditor's interest in the estates' interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest....is less than the amount of such allowed claim.

11 U.S.C. § 506(a). Debtor's contention is that the amount of the prior liens held by the City exceed the value of Myrtlewood and Thompson so LJR's entire claim is unsecured and it does not have to be provided for in Debtor's Chapter 13 plan. To evaluate this thesis, I need to determine value and deduct the amount of the prior liens which I have determined above.

Certain fundamental realities about the valuation process supply the context for the task at hand. They were well stated by the Court in In re Smith, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001):

> "Valuation outside the actual market place is inherently inexact." Rushton v. Commissioner, 498 F.2d 88, 95 (5th Cir.1974). (further citations omitted) Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. See In re Coates, 180 B.R. 110, 112 (Bankr. D. S.C. 1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of ... [the appraisal] evidence.").

Reconciling the professional appraisals, which both relied on a comparison sales approach,[17] is difficult given the paucity of information in the reports which used different properties as their base lines and presumably different assumptions about what was comparable. Symanski acknowledged that because the buildings were at the end of their economic life, and in the case of Myrtlewood had been removed, he saw the value to be in the land. Thus, he sought "nominal sales" of land (Myrtlewood) and properties with abandoned shells (Thompson). His value for Thompson is higher because it had a shell capable of rehabilitation. However, for the year at issue, 2005, his Myrtlewood appraisal is flawed because the house had not yet been removed. Symanski concedes that an abandoned shell has value, and Edelson explained that its presence facilitates reconstruction as zoning would be preserved. To what extent that value was impaired because the structure was a burned out shell was not addressed. In any event, the $2,000 value for Myrtlewood is simply too low. With respect to Thompson, LJR argues that I should give less weight to the Symanski report because he appears to select properties further from the subjects when there were multiple property transactions in the immediate area as reflected on the Edelson report.[18] As both parties produced their appraisals on the eve of trial, it is not surprising that

---

[17] The comparative sales approach selects sales of properties the characteristics of which are as close as possible to the subject property and makes adjustments to the sales prices to account for differences. The adjusted sales prices are then reconciled to arrive at an opinion of value for the subject property. Both appraisers used this approach which is well accepted for non-income producing real estate.

[18] Edelson's comparatives sales were within .10 mile of the subject whereas Symanski's were .69-.79 miles. Compare Exhibits P-8 and D-5. While Symanski did not view this to be a material factor as the properties are within the same zip code and less than a mile apart, in a changing area as I find this one to be, this might account for some of the difference. However, the
(continued...)

the significance of this distinction was not adequately explored. LJR also argues that Syzamski's comparatives are inapposite to the extent some represent properties sold at sheriff's or tax sales whereas the Edelson comps were drawn from properties listed on the "MLS", i.e., multiple listing service.[19] While Symanski refused to concede the point, contending that these types of properties are usually sold in this manner, for the purposes of this bankruptcy case, it does not follow that a distressed sale is the standard of value to be used. Finally Debtor himself, as indicated by his testimony and the higher value reflected on his Schedule A as well as his zealous efforts to retain the properties, appears to subscribe to a higher value for both properties. It seems unlikely that Debtor would pay off the City's liens in excess of $24,000 on Myrtlewood and Thompson as he proposes in his Chapter 13 plan and engage in this litigation to retain a lot presently worth $1,500 and an uninhabitable house presently worth $15,000.

---

(...continued)
real issue is whether the properties were indeed comparable. Neither inspected the interiors of the Myrtlewood (when it was standing) or Thompson houses. Symanski stated he was looking for abandoned shells which presumably would not require such inspection. It does not appear that Edelson's criterion was that narrow. While he included photographs of the comparables, they are current images of the properties and not images at the relevant time. One (2915 Thompson) appears to have been rehabilitated, one appears to be occupied and while 3030 Baltz appears boarded up, it is not clear how that condition relates to its condition in September 2005 or the date of its sale sometime earlier.

[19] While LJR's counsel made much of this distinction, Symanski opined that public records are more accurate and are normally consulted first. No explanation for not consulting the MLS was given. The statement advanced by LJR's counsel that the MLS provides wider notice of the availability of a property and promotes competitive bidding was accepted in part. A private and public sale would each generate competitive bidding although Symanski acknowledged there is more exposure on the MLS.

While I am not persuaded that Symanski's values are representative of the market for the properties, I view the Edelson opinion as being overly optimistic. Edelson was influenced by the appreciation he recently observed in the surrounding area, in particular a new development he identified in 2007 located two blocks away from Thompson. It appears that the interest that both litigants have in owning these properties has more to do with their potential for rehabilitation than their current state. Indeed many of the comparative properties that Edelson included in his report show dilapidated houses recently sold for $50,000 and more, reflecting a current confidence in the investor market for development of the area which is corroborated by the evidence of nearby construction. I conclude, as I believe both appraisers would agree, that Thompson is worth considerably more today than it was when the bankruptcy case was filed. However, I am more persuaded by Symanski's gradual escalation of value over time with the greater increase occurring in the past year as opposed to Edelson's values which almost triple between the filing and confirmation dates and reflect a significant but less drastic escalation this past year. A comparison of the range of values in Edelson's 2004 and 2005 reports does not reflect a trebling of value.[20] Without explanation of why the twelve month increase in 2005 was far greater than the 22 month increase in 2007, I have a hard time accepting Edelson's numbers

---

[20] The September 2004 reports state that there were 42 comparable properties ranging from $5,000 to $75,000 whereas the September 2005 report indicates 69 comparable properties from $10,500 to $130,000. Both suggest a doubling of values over the twelve month period. While hardly a scientific means of evaluating price escalation of any given property, these numbers lend support to my scepticism over Edelson's annual growth numbers.

at face value. Absent some research into the economic conditions of the area as they were apparent in 2005, I simply am not convinced that Edelson's appraisal opinion was not inflated to some extent by hindsight information. Indeed LJR's abandoned offer in September 2005 of a buyout from Debtor in the amount of $1,000 for Thompson[21] represents a *de minimus* investment if it truly viewed, and sought to generate an agreement to buy, a property that was supposed to be worth $50,000 at the time.

Nor do I find these reservations to be put to rest by the comparative sales proffered to support Edelson's value opinions. While he utilized the well accepted comparative approach to determining value of residential real estate, I find that modality less reliable where the sales are on speculation. There are variables not addressed in the testimony or reports, which focus only on the age, square footage, room configuration and distance from the subject, that could make his selection of comparatives inapposite. See note 17 supra. With respect to Myrtlewood, Edelson identified 69 comparable sales ranging from $10,500 to $130,000 in his September 2005 retrospective appraisal. One of his choices was a house at 3030 Baltz, proximate to Debtor's property at 3029 Baltz,[22] which he reported to have sold

---

[21] I have previously found that LJR's strategy was to pursue its lien rights to those of the Total Properties for which no release of mortgage exists and seek to negotiate a buyout of the property from the owner. Patterson I, 2007 WL 987306, at *1. While one such deal was concluded, a September 2005 negotiation for Thompson was unsuccessful when LJR offered $1,000, Exhibit D-4 at 3/20/07 hearing.

[22] The Properties are in the same general vicinity. I take judicial notice of Debtor's amended Schedule A filed May 25, 2005 (Doc. No. 31). "[F]actual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them. Larson v. Gross Bank, 204 B.R. 500, 502 (W.D. Tex. 1996) (statements in schedules). See also In re

(continued...)

for $60,000, noting that it had been sold for $10,000 six months earlier.[23] The range in pricing even in the sales he selected, $32,000 to the aforementioned $60,000, suggests that there are relevant considerations affecting price that have not been identified. Edelson chose 3029 Baltz also as a $62,500 comparable to Thompson as well as properties which sold for $36,000 and $57,000. Again they were three of 69 properties that he identified as comparable to the subject ranging from $10,500 to $130,000. His choice of comparables has obviously driven the outcome of his appraisal, and as his report discloses, the range of comparable values was broad. He did not enlighten me as to why he selected the properties that he did nor do I know whether he even investigated the circumstances surrounding the sales of those properties. In short, I cannot conclude that the three "comparables" are reflective of the price that Debtor would realize if he sold Myrtlewood and Thompson.

---

(...continued)
Musgrove, 187 B.R. 808 (Bankr. N.D. Ga. 1995) (same); In re Leonard, 151 B.R. 639 (Bankr. N.D.N.Y. 1992) (same). It values the Baltz property at $32,000. Likewise Debtor owns two properties on 30th Street which he values at $32,000 (1243) and $30,000 (1249).

[23] The September 2004 appraisal report is also interesting in what it reveals as to historic market activity nearby. Exhibit D-1. Two houses on Thompson Street (1433 and 1229) sold for $24,500 and $31,000 respectively following sheriff's sales earlier that year in which the properties went for $5,900 and $1,000. A nearby house at 2414 Sharwood sold for $7,000. The two Thompson properties appear occupied whereas the Sharwood is boarded up. One year later Edelson states that a sale at 1232 Thompson for $53,000 is useful in determining the value of Myrtlewood. Yet there is no explanation of what drives these disparate values and whether the unidentified factors that generated the high prices on Thompson would be applicable to Myrtlewood.

Because of the subjective nature of the appraisal process, courts are given wide latitude in determining value. "A court is not bound by values determined by appraisals but rather may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals." In re Karakas, 2007 WL 1307906, at *6-7 (Bankr. N.D. N.Y. May 3, 2007 (*quoting* In re Richards, 1999 WL 14680, at *7 (Bankr. E.D. Pa. Jan. 12, 1999)). In this case, I have considered the appraisal reports and the valuation testimony presented by the two appraisers and Debtor and conclude that the proper values lie between the numbers advocated by each.

In summary, I find Symanksi's value of $2,000 for Myrtlewood so low as to have little credibility. Even Debtor rendering his unprofessional opinion was willing to testify to a higher number, i.e., $5,000-$6,000, and scheduled the property at $10,000 in his verified Schedule A. By the same token, I find the Edelson value of $40,000 to be inflated. Given his opinion that the land alone in an improving local market is worth $15,000 in 2007, it is hard to understand how he can attribute $25,000 in value to that land plus a burned out house in 2005. A review of the comparatives as examined in the context of the above observations suggests that there is value of approximately $20,000-$22,500 in Myrtlewood. My task with respect to fixing a precise value for Myrtlewood is rendered easier by the fact that LJR has allocated a debt of $21,982 to that property. Since LJR's secured claim cannot exceed the amount of its debt, $21,982 establishes the ceiling for Myrtlewood; a value of $50,000 as opined by Edelson, or indeed an amount greater than $21,982 will have no bearing on LJR's secured claim on that property. With respect to Myrtlewood, I therefore

find that the value for purposes of this proceeding is $21,982. With respect to Thompson, I likewise find Symanksi's $10,500 value low based on the present development of that area. While not fully realized in 2005, astute investor/developers presumably could anticipate its potential and increased value would result. The comparables as examined in the context of the above observations suggests a value in the mid range between the two appraisers, i.e., $35,000. Edelson valued Thompson at $18,000 in 2004. My finding more accurately reflects the doubling, not trebling as he has done, of values I observed in the comparative properties from 2004 to 2005. As noted above, valuation is not an exact science. Where as here, the expert testimony is less than fully developed and thus less than helpful, the Court is left to a large degree on its own to fix a number that appears reasonable and equitable. In the proverbial battle of the appraisers, victory is allusive.

**CONCLUSION**

Subtracting the City lien of $8,983.00 from the established value of $21,982 of Myrtlewood leaves $12,999 in value to which the LJR lien attaches to the extent of its claim. Subtracting the City lien of $15,075.70 from the established value of $35,000 for Thompson leaves $19,525.00 in value to which the LJR lien attaches to the extent of its claim. As Debtor's Modified Plan has made no provision at all for these liens, the Modification Motion shall be denied. Debtor shall have twenty (20) days to file a further modified plan treating these claims and to file an objection to LJR's proof of claim to the extent Debtor

contends that it is owed less than the amount of the security I found attaches to these claims. LJR's objection to the present modification as it relates to Baltz shall be carried to the hearing on the further modification.

An Order consistent with this Memorandum Opinion shall be entered.

*Diane W. Sigmund*

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge


Dated:  September 5, 2007

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| TRACEY PATTERSON, | : | Bankruptcy No. 04-32201DWS |
| | : | |
| Debtor. | : | |
| | : | |
| TRACEY PATTERSON, | : | Adversary No. 07-0023 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LJR INVESTMENTS, LLC | : | |
| OF BUCKS COUNTY, | : | |
| aka LJR Investments, LLC, | : | |
| | : | |
| Defendant. | : | |

# ORDER

**AND NOW**, this 5th day of September 2007, upon consideration of the Complaint of the debtor Tracey Patterson ("Debtor") pursuant to 11 U.S.C. § 506 to determine the extent of the lien held by LJR Investments, LLC of Bucks County ("LJR") on real property owned by Debtor located at 1241 Myrtlewood Street, Philadelphia, PA ("Myrtlewood") and 2914 Thompson Street, Philadelphia, PA ("Thompson") (the "Adversary Proceeding") and (2) Debtor's Motion to Modify Plan after Confirmation (the "Modification Motion"); after notice and hearing;

<u>In re Tracey Patterson - Bankruptcy No. 04-32201DWS</u>
<u>Adversary No. 07-0023</u>

**And** for the reasons stated in the foregoing Memorandum Opinion, it is hereby **ORDERED** that:

1. LJR has a secured claim in the amount of $21,982 on Myrtlewood and a secured claim in the amount of $35,000 on Thompson.

2. The Modification Motion is **DENIED**. Debtor shall file an amended modification motion in support of a further modified plan which treats LJR's secured claims consistent with the ruling herein, both of which shall be filed on or before **September 25, 2007**.[1] The amended motion shall be served and noticed for hearing pursuant to Local Bankruptcy Rule 9014-3.

3. If Debtor objects to the proof of claim filed by LJR, he shall file an objection thereto on or before **September 25, 2007** stating with specificity the nature of his objection, and shall schedule such objection for a hearing contemporaneously with the amended modification motion.

*/s/ Diane W. Sigmund*

—————————————————
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

---

[1] If, as I suspect, evidence shall be required, the hearing may be set on a Tuesday at 10:30 a.m. (versus Thursday). Debtor's counsel shall contact Ms. Godfrey for the listing.

-2-